606 F.Supp. 1313 (1985)
AMERICAN NURSES' ASSOCIATION; Illinois Nurses' Association; Mary J. Anderson, Gwendolyn T. Ashton, Mary Sue Barnett, Patricia Bender, Sue Celeste Christian, Debra Cutler, Ella Vera Evans, John Fitzpatrick, Barbara Francois, Barbara Goldsberry, Delores I. Gwin, Rosemary Sue Hill, Sharon Hoyle, Estelle L. Huechteman, Marla J. Hunter, Deva Koster, Mary L. McDonald, Patricia Petrine, Mary Ritchie, Cleo B. Spires, and Carolyn K. Verson on behalf of themselves and all other similarly situated, Plaintiffs,
v.
STATE OF ILLINOIS; its Governor James Thompson; the State Department of Corrections and its Director Michael Lane; the State Department of Public Health and its Acting Director Fred Uhlig; the State Department of Mental Health & Developmentally Disabled and its Director Michael Belletire; the State Department of Veterans' Affairs and its Director David Hardwick; the State Department of Public Aid and its Director Gregory L. Coler; the State Department of Aging and its Acting Director Janet S. Otwell; the State Department of Central Management Services and its Director Louis J. Giordano; and the State of Illinois and its Governor James R. Thompson on Behalf of all other unnamed State Agencies subject to the State Personnel Code, Defendants.
No. 84 C 4451.
United States District Court, N.D. Illinois, E.D.
April 4, 1985.
*1314 Edith Barnett, Special Council, American Nurses Assoc., Washington, D.C., Richard F. Watt, Peggy A. Hillman, Michael H. Slutsky, Cotton, Watt, Jones & King, Chicago, Ill., for plaintiffs.
*1315 James I. Rubin, Butler, Rubin, Newcomer, Saltarelli & Boyd, Brigitte Schmidt Bell, Ellen M. Babbitt, Michael A. Stick, Chicago, Ill., for defendants.

MEMORANDUM OPINION
KOCORAS, District Judge:
This matter comes before the court on defendants' motion to dismiss or, in the alternative, for summary judgment. Plaintiffs are the American Nurses' Association (ANA), the Illinois Nurses' Association (INA), and twenty one individuals employed by the State of Illinois suing on their own behalf and as class representatives. The complaint charges the State of Illinois with sex discrimination in the classification and compensation of employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), the Due Process and Equal Protection clauses of the Fourteenth Amendment of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.
Plaintiffs, either fearing a premature negative response by the court to the term or for other reasons, strenuously object to defendants' labeling the action a "comparable worth" case. Distilled to their essence, however, the asserted causes of action are fundamentally dependent on recognition of the concept of comparable worth. Specifically, plaintiffs premise the suit on the proposition that a sex-based wage discrimination claim can be proved by a showing of lower pay to employees in historically female-dominated job classifications than to employees in historically male-dominated job classifications for jobs which have been evaluated as requiring equal or comparable skill, effort, and responsibility under similar working conditions. Defendants, the State of Illinois, its governor, and several state agencies, departments, and their directors, have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment against plaintiffs.
Comparable worth has been described by many as the major civil rights issue of the eighties. It has been the subject of voluminous scholarly and popular commentary, litigation, labor negotiations, and legislation in the States. Several bills addressing the issue are currently pending in Congress. Part of the impetus for the increasing attention given to comparable worth no doubt stems from the recognition that despite the dramatic increase of women entering the labor market in recent years, their earnings have remained roughly three-fifths that of males' earnings. Moreover, the debate over whether Title VII requires equal pay for jobs of comparable worth has escalated dramatically as a result of the Ninth Circuit's historic decision in Gunther v. County of Washington, 602 F.2d 882, (9th Cir.1979), aff'd, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), which the Supreme Court subsequently affirmed.
In Gunther, the Supreme Court gave greater scope to claims of sexual discrimination in compensation under Title VII as compared to similar claims under the Equal Pay Act. The Equal Pay Act only requires equal pay for equal work. Title VII, on the other hand, by virtue of Gunther, imposes an unconditional obligation on employers not to discriminate in compensation on the basis of sex, regardless of whether the claim is based on allegations of equal work.
The Supreme Court held in Gunther that Title VII's prohibition of sex-based wage discrimination is not limited, by virtue of the "Bennett Amendment", to claims of equal pay for equal worth. The Court, however, stressed the narrowness of its holding, explicitly pointing out in both the majority and dissenting opinions that the holding did not require judicial evaluation or imposition of a particular wage scale. Id. at 181-82, 101 S.Ct. at 2253-54. Consequently, Gunther does not stand for the proposition that Title VII prohibits disproportionately low pay in positions predominantly occupied by women. It establishes that Title VII categorically forbids discrimination in compensation on the basis of sex; what kind of evidence will suffice to support a claim of sex-based wage discrimination was not addressed by the Gunther *1316 court and constitutes the current legal controversy.
After carefully reviewing the briefs submitted by the parties and conducting independent research, this court concludes that unequal pay for jobs alleged to be of comparable worth on the basis of an evaluative study which the employer commissioned but never adopted does not constitute a viable legal theory under Title VII. I base this conclusion on three grounds: Congress's explicit rejection of the theory of comparable worth as documented in the legislative history of the Equal Pay Act and Title VII; the Supreme Court's emphasis on the narrowness of the issue and the holding in Gunther; and this court's judgment that permitting proof of intentional discrimination through studies of comparable worth would be neither workable nor sound.
Federal courts have a duty to apply the anti-discrimination legislation Congress has enacted in a manner consistent with Congressional intent. Two major legislative enactments create causes of action and remedies for discrimination in compensation on the basis of sex; read together, they indicate that Title VII cannot be extended to impose a particular wage scale suggested by an evaluative study which an employer has not adopted. The legislative history of the Equal Pay Act indicates that Congress carefully considered and specifically rejected a comparable worth standard when it enacted the Equal Pay Act. One year later, when debating Title VII, Congress neither explicitly nor implicitly reversed its earlier policy judgment.
Plaintiffs maintain that in setting forth the legislative history, defendants have mistakenly equated "comparable work" and "comparable worth." They contend that, in fact, during the Equal Pay Act debates, Congress was only considering resolution of the narrow problem of unequal pay to women workers for work which was virtually identical to work performed by men workers. In plaintiffs' estimation, the only issue was whether the statute's remedial purpose could best be accomplished by using language referring to "comparable work" or "equal work". Plaintiffs are correct in maintaining Congress intended the Equal Pay Act to cover only jobs that are substantially identical or equal. However, the legislative history demonstrates that in seeking the language that would best embody this intention, Congress considered, debated, and rejected "comparable worth" as a basis for finding sex discrimination.
As defendants aptly demonstrate in their brief, during the extensive hearings and debates regarding amendments and redrafts of the Equal Pay Act, both Houses of Congress indicated their intent to prevent the courts and government from analyzing and dictating wage rates in all but the narrow "equal work" situations. The House changed the initial language of the Act which describes the kind of jobs it applies to from "work of comparable character on jobs the performance of which requires comparable skills" to "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 108 Cong.Rec. 14767, 14771. Representative Frelinqhuysen clearly articulated the significance of the amendment:
[T]he jobs in dispute must be the same in work content, effort, skill and responsibility requirements, and in working conditions. As indicated earlier, it is not intended to compare unrelated jobs, or jobs that have been historically and normally considered by the industry to be different.
109 Cong.Rec. 9196 (1963). Representative Goodell, who sponsored the bill that became the Equal Pay Act, reiterated this view with specific reference to the "comparable work" versus "equal work" distinction:
Last year when the House changed the word "comparable" to "equal" the clear intention was to narrow the whole concept. We went from "comparable" to "equal" meaning that the jobs involved should be virtually identical.... We do *1317 not expect the Labor Department people to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, "Well, they amount to the same thing," and evaluate them so they come up to the same skill or point.
109 Cong.Rec. 9197 (1963). As the Fourth Circuit has stated, Congress "did not authorize the Secretary [of Labor] or the courts to engage in wholesale reevaluation of any employer's pay structure in order to enforce their own conceptions of economic worth." Brennan v. Prince William Hospital Corp., 503 F.2d 282, 285 (4th Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). Moreover, the Congressional debates explicitly document Congress's specific intention that the Equal Pay Act "not be invoked to mandate equality of pay for jobs of different content." Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1173 (3d Cir.1977).
The legislative history of the Equal Pay Act and Congress's explicit rejection of the theory of comparable worth controls in any interpretation of Title VII, passed less than a year later, because nothing in the language or legislative history of Title VII indicates an intent to reverse Congress's prior decision not to adopt comparable worth as a method of identifying discrimination. Moreover, although the Supreme Court has held that Title VII is broader than the Equal Pay Act in certain respects, in the one Supreme Court case examining the interrelationship of the Equal Pay Act and Title VII, the Court distinguished the narrowness of the question before them from a comparable worth claim. County of Washington v. Gunther, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).
In Gunther, the Supreme Court held that an employer may not adopt a particular compensation system and then unequally apply it in a discriminatory manner. The defendant county conducted a survey of the wages commanded in the market place for jobs equal to those of its own employees. The county then purportedly adopted the market standard but actually paid male prison guards a higher percentage of their surveyed market worth than it paid female prison guards. A crucial distinction exists between the facts of the Gunther case and the case before this court. The employer in Gunther had deviated from the results of a job evaluation system it had adopted in setting the wage rates of women's jobs. In other words, a consistent pattern emerged of underpayment of women's jobs relative to their accepted evaluated worth, while men's jobs were paid in accordance with their accepted evaluated worth as determined by the employer's own job evaluation plan.
In the current case, no such implementation of the commissioned evaluative study has taken place. The Court in Gunther did not hold that discrimination can be inferred from the mere fact that a particular job evaluation study has concluded a disparity exists between predominantly male and predominantly female jobs. Nor did the Court say that an employer who commissions a job evaluation study necessarily has to conform its pay rates to the results of its study. Rather, job evaluation was an element of proof in Gunther because there was a clear showing the employer deviated from the results of its own job evaluation in setting the rates for women's jobs but not for men's jobs.
Plaintiffs concede that defendants never "implemented" the findings of the evaluative study, but they make two arguments for why the results of the study, nevertheless, constitute probative evidence of discrimination. First, plaintiffs argue essentially that because the evaluative study was funded by the State and conducted under the auspices of the Illinois Commission on the Status of Women, the State's failure to pay its employees according to the results of that study is actionable. This argument is simply without merit; mere funding and performance of such a study do not commit an employer to adopting the results of the study. Nothing in the law obligates an employer to adopt a new pay structure simply because a particular evaluative study indicates that a different *1318 set of pay relationships would be more equitable. Such a rule would create a disincentive to employers to conduct job evaluation studies at all. What the law does require is equal application of any particular wage scale an employer does adopt, and plaintiffs have made no claims that defendants have violated this principle in the current case. Although plaintiffs claim that this suit, like Gunther, does not require a court to make its own subjective assessment of the value of the jobs in question, plaintiffs do, in effect, request the court to impose a particular wage scale on an employer. This court declines to assume such supervisory power.
Such an effect would also result if the court adopted plaintiffs' second argument for why the results of the study constitute probative evidence of discrimination, i.e., that the State's failure to take corrective action to implement the findings of the study supports a finding of unlawful discrimination. Job evaluations can be a useful diagnostic tool, but the law does not require an employer to implement immediately whatever pay changes a particular study suggests, without regard to economic considerations, the labor market, bargaining demands or the possibility that some other study might produce different results. As Chief Judge Barbara Crabb of the Western District of Wisconsin wrote in a similar context:
Nothing in the law indicates that the employer's liability extends to conditions in the marketplace which it did not create. Nothing indicates that it is improper for an employer to pay the wage role necessary to compete in the marketplace for qualified applicants.
Briggs v. City of Madison, 536 F.Supp. 435, 443 (W.D.Wisc.1982). The job evaluation cases relied on by plaintiffs do not support use of comparable worth evidence to infer intent, to prove discrimination, or to mandate a remedy.
Finally, over and above my judgment that neither the legislative history of Title VII nor the Supreme Court's holding in Gunther authorizes proof of a prima facie case through comparable worth evidence, I am unwilling to expand the limits of Title VII to encompass such a claim. In deciding a comparable worth claim, a court would be compelled either to evaluate the validity of the job evaluation system used by an employer, including any external factors, and then impose a particular wage system on the employer, or in the absence of such a system to determine the relative worth of the job in question by a comparison of it to other jobs in the employer's establishment. Such "standardless supervision" by the courts is, in my judgment, unauthorized and unwarranted. Spaulding v. Univ. of Washington, 740 F.2d 686, 701 (9th Cir.1984).
Aside from the problems inherent in the implementation and administration of a comparable worth standard by the courts, any criteria of pay equity ultimately rests on value judgments. Although some correlation between sex-segregated jobs and lower wages no doubt exists, the job characterization factor is undeniably only one among many of the determinatives of pay scales. Because jobs do not have an intrinsic value that can be scientifically measured, the limitations inherent in job evaluation techniques prohibit the proposed extension of Title VII.
It is on this fundamental point that I depart from Judge Tanner's reasoning in the one case, to date, which has recognized a broad based comparable worth claim. In AFSCME v. State of Washington, 578 F.Supp. 846 (D.Wash.1983), currently on appeal, Judge Tanner concluded that the State of Washington violated Title VII by compensating women employees in female-dominated job classifications at levels below those paid to employees in male-dominated job classifications that had been rated comparable in State-sponsored job evaluation studies. The State had commissioned studies that placed numerical values on State jobs, but no agreement had been reached, at least until 1983, that the State would adopt a new pay scale on the basis of those numbers. To reach the conclusion in the Washington State case, the court *1319 had to assume that the results of the State's job evaluation studies were valid measurements of the relative "worth" of the jobs in questionmore valid, in fact, than the values placed on those jobs by the market which, the State alleged, formed the basis for the State's existing pay scales. I, unlike Judge Tanner, am unwilling to treat the results of the State's job evaluation studies as the true and reliable measurement of the inherent worth of the surveyed jobs.[1]
The federal policy embodied in Title VII is that individuals should be entitled to equal opportunities, not results, in the job market. The courts under existing authority cannot require an employer to reassess the relative worth of all the jobs in the employer's establishment and then to adopt a particular wage structure suggested by the assessment.
The court cannot infer intent merely from the existence of wage differences between employees in historically female-dominated job classifications and employees in historically male-dominated job classifications. Although plaintiffs also allege discrimination in classification, as defendants point out, an allegation of classification discrimination can only take two forms, neither of which is actionable under the current complaint. Plaintiffs are alleging either that persons performing equal jobs were misclassified and paid differently (an equal pay claim) or, alternatively, that persons performing "comparable jobs" are properly classified but allegedly paid improperly; this can only be proven by impermissable evidence of comparable worth.
Moreover, as the Ninth Circuit has noted, relying on a factor such as competitive market prices does not qualify as a facially neutral policy or practice having discriminatory impact for the purposes of a disparate impact analysis. Spaulding v. University of Washington, 740 F.2d 686 (9th Cir.1984) cert. denied, ___ U.S. ___, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). Rather, the disparate impact model was developed as a form of pretext analysis to handle specific employment practices not obviously job related, such as employers' intelligence tests which adversely affect minorities. Thus, for Title VII purposes, plaintiffs' simply labeling defendants' actions a policy or practice is not sufficient to state a cause of action. Plaintiffs also contend that they have raised claims involving equal pay violations. The current complaint simply does not allege facts sufficient to support an equal pay claim, and the plaintiffs do not assert a violation of the Equal Pay Act.
In addition to allegations of violations of Title VII, plaintiffs have also alleged violations of the Fourteenth Amendment and § 1983. The Seventh Circuit has held that a court's evaluation of § 1983 claims in a discrimination case must be guided by the same principles which are applicable to the evaluation of Fourteenth Amendment claims in a discrimination suit. Mescall v. Burrus, 603 F.2d 1266, 1271 (7th Cir.1979). Therefore, plaintiffs' § 1983 and Fourteenth Amendment claims may be considered simultaneously.
Plaintiffs' § 1983 and Fourteenth Amendment claims are based on the argument that defendants' intentional practice of paying lower salaries to employees in predominantly female job classifications than to employees in predominantly male job classifications is a violation of the due process and equal protection clauses. *1320 Plaintiffs rely on the same argument made in support of their Title VII claim to support their § 1983 and Fourteenth Amendment claims.
Since I have found that plaintiffs' complaint of intentional sex discrimination under Title VII, cannot stand, they cannot rely on their Title VII claim to establish the requirement of discriminatory purpose necessary for a Fourteenth Amendment claim. See, Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Mescall v. Burrus, 603 F.2d at 1271. Plaintiffs make no other argument nor cite any other evidence to demonstrate that a discriminatory purpose influenced the State's classification practice. Accordingly, plaintiffs have failed to state a claim for relief under § 1983 or the Fourteenth Amendment, as well as under Title VII.
The facts actually alleged in the complaint are that a comparable worth evaluative study was generated by a legislative advisory commission but never implemented by the State. Because plaintiffs' action based on the concept of comparable worth goes far beyond the existing statutory law, Supreme Court precedent, and the application of constitutional provisions, defendants' motion to dismiss for failure to state a cause of action will be granted.
NOTES
[1] The Washington State case presented an unusual fact situation in that the State of Washington had recognized the pay disparity problem indicated by the studies and had begun to deal with it as a matter of public policy. In December of 1976, for example, Governor Daniel Evans included a $7 million appropriation in the budget to begin implementation of a new pay scale suggested by the comparable worth study. When his successor, Dixie Lee Ray, became Governor in 1977, however, she took the appropriation out of the budget even though a surplus existed in the 1976-77 budget. In effect, the governor and the top personnel people in the State of Washington had practically admitted their wage system was discriminatory and then consciously decided to do nothing to remedy it. The court thus viewed the state's unwillingness to remedy a recognized pattern of sex discrimination as evidence of intentional unfavorable treatment of employees in predominantly female job classifications. AFSCME v. State of Washington, 578 F.Supp. 846, 866-67 (D.Wash.1983).